UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JO CLARK, ) | | |
|     Plaintiff, ) | | |
| ) | | |
|   vs. ) | | 1:05-cv-1137-SEB-TAB |
| ) | | |
| HEALTH CARE EXCEL, INC., ) | | |
|     Defendant. ) | | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 29] filed by Defendant, Health Care Excel, Inc. ("Health Care Excel"), pursuant to Fed. R. Civ. P. 56. Plaintiff, Jo Clark ("Clark"), brings this suit against Defendant, her former employer, alleging that it violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, with regard to the terms and conditions of her employment, including the termination of her employment in June 2004. For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment as to both claims.[1]

Factual Background

Health Care Excel is an Indiana corporation which provides health care management consultation, products, and services. Def.'s Mem. at 2-3. In November

---

[1] In addition, the parties have jointly filed a Motion for Continuance of Final Pre-Trial Conference and Jury Trial Dates [Docket No. 42]. This motion is DENIED as moot.

1998, Health Care Excel hired Clark as a scheduling secretary. She was forty years old at the time. Id. at 4. Shortly thereafter, Clark was transferred from the scheduling secretary position to a secretarial position within the Prior Authorization Department. She was subsequently transferred again to the role of Support Specialist within the Prior Authorization Department. The Support Specialist position is typically lower-paid than the secretarial positions, but Clark's pay was not decreased, and she remained the highest paid Support Specialist during the entire course of her employment. Id. at 5. As a Support Specialist, Clark was responsible for numerous clerical activities, including data entry, making phone calls, directing and delivering mail, and working with case files. Clark acknowledges that the responsibilities of a Support Specialist require the use of one's hands "a hundred percent of the time." Def.'s Ex. F at 79.

On August 13, 1999, Clark received a Performance Appraisal from her supervisor, Lynn Reynolds. See Def.'s Ex. H. Overall, Clark's job performance was rated a "6," which placed her in the "competent" range. Her attitude was categorized as "fair," the second lowest available rating. Id. A few months later, on November 2, 1999, Clark was evaluated again by then-supervisor Lynda Servies ("Servies"). In that evaluation, Clark's overall performance was again placed in the "competent" range, and her attitude was again categorized as "fair." In her comments on the evaluation, Servies noted that Clark had shown "tremendous flexibility" over the past year, but also referred to Clark's "instability in attitude." Def.'s Ex. I. Clark acknowledged that Servies told her she should appear happier and "keep a smile on [her] face." Def.'s Ex. F at 111-14. Clark

had another performance evaluation on October 20, 2003, in which she was again rated "competent" and was granted a five percent merit-based pay increase. Pl.'s Ex. 10 (Tab B).

In November 2003, Clark received a disciplinary memo regarding her "attitude and cooperation" within the department. Def.'s Ex. J. The memo noted that, among other problems, Clark had "displayed unprofessional behavior toward [her] peers and management." As a result, Clark was directed to "present a positive attitude toward [her] work and co-workers" as part of a Performance Improvement Plan ("PIP"), and was informed that failure to comply would result in additional action, possibly including the termination of her employment. Id.

Three months later, on February 20, 2004, Clark received another disciplinary notice based on the same behavioral issues, as well as the use of profanity toward her supervisor.[2] See Def.'s Ex. K. Again, Clark was placed on a PIP and instructed to present a positive attitude toward her work, co-workers, and management, and was informed that "[f]ailure to comply [would] result in immediate termination." Id. The PIP period was to be closed in thirty days barring further improper behavior.

On March 12, 2004, Clark's supervisor Dee Witt ("Witt") sent Servies an email informing her that she had wished to terminate Clark's employment after the profanity

---

[2] Though the disciplinary memo states that plaintiff used profanity toward her supervisor, Clark maintains that she merely cursed under her breath during a personal conversation with another employee within the vicinity of her supervisor. Def.'s Ex. F at 101. Clark testified at her deposition that she believed the disciplinary notice was "a little trumped up." Clark Dep. at 101.

incident, but instead placed her on the PIP until she could find a replacement Support Specialist. Witt informed Servies that she had now found a suitable replacement employee and "wanted to get [Servies's] blessing" before terminating Clark's employment. Pl.'s Ex. 3 (Tab B). Witt informed Servies that Clark's work was "fine, but her increasingly malicious attitudes, defiant behavior towards management, and lack of team work have taken its toll on me and this department. I feel that it is time for her to go and for [the Prior Authorization Department] to get some new blood in this group." Id. Servies responded by asking Witt how Clark's behavior had been since the initiation of the PIP. Witt stated that "[a]s always, when Jo is on a PIP, she is as quite [sic] as a mouse" and was not interacting with her supervisors, but that when Clark's PIP expired, she anticipated that it would be a "free for all." Id. Servies responded by asking "if there is no documentation to support current inappropriate behavior or inability to perform the work expected, how can we justifiably terminate an employee while the PIP is still open?"[3] Id. Subsequently, on March 22, 2004, Clark sent an email to supervisor Kim Lashbrook notifying Lashbrook that Clark's PIP had reached the thirty-day mark, and the PIP was officially closed by Dee Witt. Id. Clark was not terminated at this time.

On March 25, 2004, Clark requested and was then granted medical leave time pursuant to the Family and Medical Leave Act in order to have surgery on her right hand, due to carpal tunnel syndrome and other problems. See Def.'s Ex. N. Before this date,

---

[3] No further reply from Witt is included in the string of emails designated as Pl.'s Ex. 3 (Tab B).

Health Care Excel had no record of any medical restrictions or impairments for Clark. See Def.'s Mem. at 7. Clark was precluded from working for two weeks after her surgery (which occurred on April 12, 2004), but her physician expected she would regain full use of her arm in about three months. Id.

Clark returned from leave on May 3, 2004. Because she was unable to perform many of the Support Specialist functions requiring two hands, she was temporarily reassigned to the switchboard in order to accommodate her restrictions. Clark testified that Witt told her that she felt Clark was unable to perform her normal work duties at that time. Clark Dep. at 154. In late May or early June, Clark returned to her position as Support Specialist, though her medical restrictions were not lifted in their entirety until July 17, 2004 (after the termination of her employment).[4] Def.'s Mem. at 7-8; Clark Dep. (Def.'s Ex. F) at 132. During this time she wore a splint on her right arm which was visible to those with whom she worked. Clark Aff. ¶ 6. Clark testifies that around this time, she reported to Servies that she felt Witt was discriminating against her on the basis of her right arm surgery. Pl.'s Resp. at 13, citing Clark Dep. at 58-59.

On June 4, 2004, Regina Walker ("Walker"), Support Specialist in the Prior Authorization Department, sent an email to Sharon Smith ("Smith"), Chief Executive Officer of Health Care Excel, stating that she had decided to resign from her position due to rude, disruptive, and unprofessional behavior within the department and a negative,

---

[4] Clark testified that she falsely indicated to her supervisors that she was released from medical restrictions on June 15, 2004. Def.'s Ex. F, Clark Dep. at 134.

hostile atmosphere among the Support Specialists.  Def.'s Ex. Q ¶ 3.  Smith went to discuss the situation with Walker and Lynda Servies, who was at that time a Program Director within the department.  Walker stated specifically that Clark was rude to her and treated her as a "non-person."  Id. ¶ 5.  Further, Smith testified that Walker told her Clark was the "ringleader" regarding the negative atmosphere among the Support Specialists, that she encouraged other Support Specialists to be rude to new employees, that she refused to train new employees, and that her behavior contributed to a high turnover rate within the department.  Id. ¶¶ 6-7.

In light of Walker's complaint, Smith requested that Servies investigate the situation.  Servies interviewed two other staff members, Charlotte Monnett ("Monnett") and Sheree Schmidt ("Schmidt"), who confirmed that Clark and two other Support Specialists – Millissa Talley ("Talley") and Angi Brock ("Brock") – formed a "clique" that was rude and abusive toward other employees.  Monnett and Schmidt testified that "while Talley and Brock participated in the inappropriate behavior, Clark was the clear ringleader with regards to the negative, rude behavior," and that the department was a better place to work when Clark was not around.  Def.'s Ex. R ¶¶ 7-8; Def.'s Ex. S ¶ 7.  Both testified that they told Servies that they were intimidated by Clark.  Def.'s Ex. R ¶ 9; Def.'s Ex. S ¶ 8.  Based on her investigation, on June 14, 2004, Servies suggested to Center Director Kim Courtad that Clark's employment be terminated in order to "end the

tyranny" within the department.[5]  Def.'s Ex. A ¶ 13.  Accordingly, on June 18, 2004, Clark was told by Witt, her supervisor, that her employment with Health Care Excel was being terminated because she was "not a good fit."  Clark Dep. at 135.  Clark was forty-six years old at the time.

On August 24, 2004, Clark timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging that since the fall of 2003,[6] Health Care Excel had discriminated against her because of her age and disability.  Def.'s Ex. T.  She filed her complaint in the instant case on August 1, 2005, alleging that she had been "placed under a management microscope, held to higher standards than her co-workers, continually questioned regarding her medical condition, and harassed by her supervisor Dee Wit[t], a substantially younger individual."  Compl. ¶ 15.  Clark alleges that her employment was terminated in violation of the ADEA and the ADA, and that she was unlawfully disciplined in violation of the ADA.  On July 7, 2006, Health Care Excel filed a Motion for Summary Judgment on all claims, on which we now rule.

---

[5] Servies asked Courtad in an email whether Health Care Excel could terminate Clark's employment immediately or whether they had to wait "until she acts up, which is just a matter of time."  Pl.'s Ex. 2 (Tab B) (Bates stamp 0138).  Courtad responded (via email) that "we are an at will employer and able to terminate Jo Clark at any point in time."  Id.

[6] The Charge of Discrimination, and the Complaint (at paragraph 12), actually allege that the discrimination began in the fall of 2004, but Clark acknowledges that these are typographical errors.  See Pl.'s Resp. at 9 fn. 2.  Health Care Excel attempts to profit from these errors by arguing that Clark cannot bring ADA or ADEA claims against it because she was not employed by Health Care Excel in the fall of 2004 (having been discharged in June 2004).  In the interests of justice, we decline to accept Health Care Excel's rather disingenous argument, and will consider Clark's claims on the merits.  See Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice.").

<u>Legal Analysis</u>

*A.	Standard of Review*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u>, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove any single essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that

end, we carefully review the record for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

*B.     Clark's ADEA Claim*

The ADEA, 29 U.S.C. § 621 *et seq.*, is intended to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Accordingly, it is unlawful under the ADEA for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age" or "to limit, segregate, or classify his [or her] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his [or her] status as an employee, because of such individual's age." 29 U.S.C. § 623(a).

A plaintiff may prove his or her claim of age discrimination either by presenting direct evidence of discrimination or by proceeding under the McDonnell Douglas burden-shifting method of proof. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Here, Clark acknowledges that she has "no evidence of the 'smoking gun' variety that, in itself, proves discriminatory treatment 'without reliance on inference or presumption.'" Pl.'s Resp. at 18.  Therefore, she has opted to proceed solely under McDonnell Douglas analysis.  Under this method, a plaintiff must initially demonstrate a *prima facie* case of discrimination.  If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the defendant can offer a legitimate nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual.  Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

Thus, our initial inquiry is whether Clark has demonstrated a *prima facie* case of age discrimination in violation of the ADEA.  In order to do so, Clark must show (1) that she was part of the class protected by the ADEA – that is, she was over forty years old; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) that the circumstances surrounding the adverse action indicate that it is more likely than not that her age was the reason for it.[7]  See Griffin v.

---

[7] We note that the parties consider the fourth prong of McDonnell Douglas analysis in terms of whether Clark was treated less favorably than younger, similarly situated employees. See, e.g., Pl.'s Resp. at 19.  There is support for this articulation of the fourth prong in several Seventh Circuit cases.  See, e.g., Rooney v. Koch Air, LLC, 410 F.3d 376, 380-81 (7th Cir. 2005); Amadio v. Ford Motor Co., 288 F.3d 919, 924 (7th Cir. 2001).  However, the Seventh Circuit has also stated that this prong is not necessary "to make out a prima facie case, so long as there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of statutorily proscribed criterion." Leffel v. Valley Financial Svcs., 113
(continued...)

11

Potter, 356 F.3d 824, 828 (7th Cir. 2004) (applying McDonnell Douglas framework to ADEA claim).

Because it is undisputed that Clark was over 40 years old during the relevant time frame, and that Clark suffered an adverse employment action (her discharge), we need only address the second and fourth prongs of Clark's *prima facie* claim. We first consider whether Clark was meeting Health Care Excel's legitimate employment expectations. Health Care Excel contends that she was not, citing Clark's checkered disciplinary history within the Prior Authorization Department. As discussed above, Clark had been informed that her attitude was merely "fair" in two separate performance reviews (one of which specifically noted her "instability in attitude"), and had also received two separate disciplinary notices related to her attitude and behavior. Shortly after the second of these notices, Clark was identified by a resigning co-worker (Walker) as a "ringleader" who engaged in and encouraged unprofessional, rude behavior within the department.[8] Def.'s

---

[7](...continued)
F.3d 787, 793 (7th Cir. 1997). To determine whether the circumstances suggest that the plaintiff's age was the reason the employer took adverse action against her, the plaintiff "may (not must)" demonstrate that "similarly situated . . . employees were treated more favorably." Timmons, 2006 WL 3512462, at *6.

[8] Plaintiff argues that Walker's statements to Smith (as well as Schmidt and Monnett's statements to Servies) are inadmissible hearsay. See Pl.'s Resp. at 7-8. However, Health Care Excel contends that the statements do not constitute hearsay because they are not being introduced to prove the truth of the matter asserted. See Fed. R. Evid. 801(c); Def.'s Reply at 6 fn. 5. We agree with Health Care Excel's contention and properly consider these statements. The relevance of the statements by Clark's co-workers to her supervisors is not their truthfulness, but the fact that they were made and the effects they had upon the listener. In other words, Health Care Excel introduces these statements in order to demonstrate that they received complaints which led them to terminate Clark's employment (*not* to demonstrate that Clark was
(continued...)

12

Mem. at 14-15. Moreover, in Servies's investigation of Walker's claims, two other employees (Monnett and Schmidt) identified Clark as a "ringleader" who engaged in disruptive and intimidating behavior. Therefore, Health Care Excel argues, Clark cannot establish that she was meeting its legitimate employment expectations, and thus cannot surmount summary judgment on this prong.

Clark counters that she was meeting Health Care Excel's legitimate expectations. She points to her overall employment ratings of "competent" in each of the two performance reviews cited by Health Care Excel, and the positive comments contained therein, as well as her merit-based pay increase in 2003. Pl.'s Resp. at 19-20. Further, Clark maintains that she never gossiped about anyone in the office, never made fun of her co-workers, and performed her job well. Moreover, she claimed to have been friendly with Walker and to have gotten along with Monnett and Schmidt, and not to have made fun of or argued with them. Pl.'s Resp. at 5, 10, 20; Clark Dep. at 106-09.

In addition, Clark argues that her job performance was "in no way wanting" until Witt became her supervisor.[9] She contends that, after that, Health Care Excel applied its expectations in a disparate manner, and was harder on her than on other similarly situated employees. See Pl.'s Resp. at 20. Clark accurately notes that "[w]hen a plaintiff

---

[8](...continued)
rude to Walker, Schmidt, or Monnett), and they are admissible for this purpose. See Cooper-Schut v. Visteon Automotive Systems, 2003 WL 1702261 (S.D. Ind. 2003) at *2 fn 2.

[9] Health Care Excel disputes this, noting that Clark was warned about her attitude in performance evaluations as far back as 1999, and was issued a PIP in November 2003, before Witt became Clark's supervisor. Def.'s Reply at 9 fn. 11.

produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . . the second and fourth prongs of McDonnell Douglas merge[.]" Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002). Thus, we will consider the second and fourth prongs of Clark's *prima facie* claim together.

Clark argues that she was treated less favorably than other similarly situated employees in that she was disciplined for misconduct while others were not.[10] Specifically, she points to an incident in which Regina Walker, Angi Brock, and Millissa Talley (all three of whom were Support Specialists who reported to Witt) were written up for "loud verbal arguments that had the potential to escalate into a physical brawl." Pl.'s Resp. at 21. Clark states that such conduct should have resulted in immediate termination according to Health Care Excel policy. However, Clark concedes that each of these employees *was* disciplined and placed on a PIP after the incident. Id.

In addition, Clark points to the fact that when Regina Walker complained about Clark's poor treatment of her to Sharon Smith, she identified *all* of the support specialists

---

[10] In addition to Clark's allegations about the disciplinary records of Walker, Brock, Talley, and Allen, discussed *infra*, Clark alleges numerous incidents of misconduct by two of her supervisors, Dee Witt and Kim Lashbrook. Pl.'s Resp. at 22. In order to demonstrate that an employee is similarly situated, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects." Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). This includes whether the plaintiff and the comparator had comparable experience and job responsibilities and whether they reported to the same supervisor. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). Witt and Lashbrook were Clark's supervisors, with entirely different job descriptions, and thus clearly cannot be considered similarly situated employees for purposes of this analysis.

(including Brock, Talley, and another specialist, Mike Allen) as refusing to talk to her unless directly ordered to do so, making fun of her, and otherwise behaving badly, and identified specific incidents in which Brock and Talley had acted unprofessionally toward her.  However, Clark maintains that no disciplinary action was taken against any other support specialists (even though Brock and Talley had prior violations) as a result of Walker's complaint.  Id.  Clark maintains that Allen, Brock, and Talley were all under the age of forty when Clark was fired, and none of them were under medical restrictions.  Id. at 22.

Clark further asserts that Walker herself was also issued a written warning with regard to her job performance in November 2003.  She claims that Walker continued to make mistakes with respect to her job duties after the warning, and could have been terminated by Servies at that point, but was not.  Id.

We hold that Clark's assertions about disparate disciplinary expectations between herself and similarly situated employees do not establish a *prima facie* claim of age discrimination.  In order for an employee to be similarly situated to a plaintiff for purposes of McDonnell Douglas comparison, the comparator must be similar "in terms of performance, qualifications, and conduct. . . . This normally entails a showing that the two employees . . . had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).  Clark has not identified such comparators here.  Despite the fact that Brock, Talley, Allen, and

Walker may not themselves have been paragons of professional conduct,[11] Clark has not presented any evidence that any of them were repeatedly warned about attitude problems or were identified as a "ringleader" by numerous employees with regard to a negative work atmosphere, as she was. No one has said about them that they were intimidated by their behavior or found the Prior Authorization Department to be a better place to work in their absence, as Schmidt and Monnett said about Clark. Clark has not established that the conduct of any of her proposed comparators was as egregious as hers, nor that she was disciplined in accordance with stricter employment expectations than they.[12] See Fuka v. Thomson Consumer Electronics, 82 F.3d 1397, 1405 (7th Cir. 1996); Flores v. Preferred Technical Group, 182 F.3d 512 (7th Cir. 1999) (holding that employee had nondiscriminatorily terminated employee who was the "ringleader" of office problems, even though other involved employees had not been discharged). It is not our charge to

---

[11] We note further that Clark admits she has no personal knowledge beyond "[her] own observations" and beliefs regarding the performance evaluations or personnel files of other Support Specialists, and that some of her claims regarding the conduct and discipline similarly situated employees are supported by scant evidence in the record. See Def.'s Ex. F p. 166. We note again that a nonmovant's speculative statements which are lacking in a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).

[12] It should be noted that, in addition to Clark's proposed "similarly situated" comparators, she introduces Dee Witt's statement that it was time to get "new blood" in the department as further circumstantial evidence that she was discharged due to her age and/or disability. The Seventh Circuit has held that such comments do not, by themselves, demonstrate discrimination. See Beatty v. Wood, 204 F.3d 713, 716-17 (7th Cir. 2000) ("'new blood' . . . does not, in isolation, evidence age-based discriminatory animus"); (Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) ("Standard usage and common sense dictate that . . . 'new blood' means a change. [Such] comments . . . reviewed in the abstract . . . simply cannot support a determination of age bias.").

serve as a "super-personnel department" and decide whether Health Care Excel implements its disciplinary policies reasonably, so long as it does not implement them in a discriminatory manner. See Cardoso v. Robert Bosch Corp., 427 F.3d 429, 435 (7th Cir. 2005) ("As we have often stated . . . the court is not a 'super-personnel department' intervening whenever an employee feels he is being treated unjustly."). Here, there is no evidence that they have done so. Thus, Clark has failed to establish a *prima facie* case of discrimination under the ADEA, and summary judgment for Health Care Excel is GRANTED as to that claim.

*C.     Clark's ADA Claim*

The ADA, 42 U.S.C. § 12101 *et seq.*, "protects 'qualified individuals with a disability' from discrimination in their employment, the hiring process, or promotions." Rooney v. Koch Air, LLC, 410 F.3d 376, 380 (7th Cir. 2005) (citing 42 U.S.C. § 12112(a)). When a plaintiff, such as Clark, seeks to prevail on a claim of discrimination without direct evidence of discriminatory motive or intent, we again employ the McDonnell Douglas burden-shifting method of proof. McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). As in the ADEA context, the plaintiff must initially demonstrate a *prima facie* case of discrimination as the first step in the McDonnell Douglas framework. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) he or she is disabled within the meaning of the ADA,

17

(2) his or her work performance met his employer's legitimate expectations, (3) he or she suffered an adverse employment action, and (4) circumstances indicate it is more likely than not that Plaintiff's disability was the reason for the adverse employment action. See Leffel v. Valley Fin. Servs., 113 F.3d 787, 793 (7th Cir. 1997); Spath v. Hayes Wheels Int'l–Indiana, Inc., 211 F.3d 392, 396 (7th Cir. 2000). In order to establish the fourth prong, the plaintiff may seek to demonstrate that similarly situated employees received more favorable treatment (giving rise to an inference that the cause of the adverse employment action was, indeed, the plaintiff's disability). See, e.g., Spath, 211 F.3d at 396.

We can readily dispense with Clark's ADA claim for the same reasons that we granted summary judgment for Health Care Excel on her ADEA claim.[13] Clark raises no unique arguments under her ADA claim regarding whether she was meeting Health Care Excel's legitimate employment expectations or whether circumstances indicated it was likely that she was terminated due to her disability. As discussed above, Clark has not

---

[13] In addition to the reasons articulated herein for granting summary judgment on Clark's ADA claim – namely, Clark's failure to establish the second and fourth prongs of a *prima facie* claim – we further note that the parties dispute whether Clark is able to establish the *first* prong – that is, whether she is disabled within the meaning of the ADA. An individual is disabled under the ADA if he or she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. See 42 U.S.C. § 12102(2); Dyke v. O'Neal Steel, Inc., 327 F.3d 628, 632 (7th Cir. 2003). Clark argues that she meets this requirement because Health Care Excel regarded her as disabled – a claim she bases on her interactions with Dee Witt after returning from FMLA leave. See Pl.'s Resp. at 25-27. Health Care Excel vigorously disputes this contention. See Def.'s Mem. at 24-25; Def.'s Reply at 15-17. Because we hold on other grounds that Clark has not established a *prima facie* claim of discrimination under the ADA, we need not make a determination as to whether Clark has met her burden with regard to this prong.

demonstrated that she was meeting Health Care Excel's legitimate employment expectations, that similarly situated employees were treated more favorably than she was, nor that employment expectations were applied disparately as to her.  Thus, she has failed to establish the second and fourth prongs of a *prima facie* ADA claim against Health Care Excel, and summary judgment is thus GRANTED in favor of Health Care Excel on this claim as well.

For the foregoing reasons, we GRANT summary judgment in Health Care Excel's favor as to both of Clark's claims, and final judgment will be entered accordingly.  IT IS SO ORDERED.

Date: 01/19/2007

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ryan C. Fox
HASKIN LAUTER LARUE & GIBBONS
rfox@hlllaw.com

Aarika Denise Mack
BARNES & THORNBURG LLP
aarika.mack@btlaw.com

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com